IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | |
|---|---|
| CARL GREIG, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO.5:23-cv-00030 |
| § | |
| TEXAS A&M UNIVERSITY - § | |
| TEXARKANA, § | |
| § | |
| Defendant. § | |

## JOINT PRETRIAL ORDER

This cause came before the court at a pre-trial management conference held on February 27, 2025, pursuant to Local Rule CV-16 and Rule 16 of the Federal Rules of Civil Procedure.

A.    COUNSEL FOR THE PARTIES

Plaintiff: Michael E. Coles and Elizabeth Lamberson

Defendant: Kelsey Warren

B.    STATEMENT OF JURISDICTION

This Court has Federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

C.    NATURE OF ACTION

This is an employment discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

D.    CONTENTIONS OF PARTIES

Plaintiff contends that he was forced to resign in lieu of termination from his employment with Defendant Texas A&M University – Texarkana due to his race (White).

Defendant contends that it did not discriminate against Plaintiff because of his race. Plaintiff's race had no effect on any employment decisions made by Defendant. Defendant had a legitimate, non-discriminatory reason for Plaintiff's resignation due to Plaintiff's job performance and failure to address serious student complaints.

E.   STIPULATIONS AND UNCONTESTED FACTS

1. Defendant Texas A&M University - Texarkana is a public state university system and is part of the Texas A & M System, which is based in College Station, Texas.

2. Greig is a white male.

3. Greig worked for Defendant in various student support roles, including Assistant Vice President of Student Affairs/Dean of Students, for approximately twenty-five years.

4. Part of Greig's job duties also included investigating student complaints about other students' violations of Defendant's Code of Conduct and other offensive behavior.

5. In certain instances, allegations related to student misconduct implicated Title IX of the Education Amendments of 1972, now known as the Patsy Mink Equal Opportunity in Education Act.

6. Because Defendant existed as part of the Texas A & M System, Greig sought and received guidance from Richard Olshak, the Texas A & M System Title IX Coordinator, based in College Station, Texas. Mr. Olshak provided guidance related to Title IX investigations.

7. For compliance purposes, Defendant is required to document and maintain records related to its investigations of student complaints, particularly when related to alleged violations of state or federal law, including anti-discrimination laws.

8. Greig investigated a complaint by a disabled student concerning her dorm accommodations.

9. The elevator in the dorm had been broken for some time, so Greig arranged for the student to move to a first-floor room. But the laundry facilities were located on the second and third floors, so Greig arranged for the student to access other, accessible laundry facilities.

10. The parts needed to repair the elevator were not available due to Covid-related supply chain issues.

11. Defendant conceded that Greig had no "failures or shortcomings" with respect to this student's complaint.

12. In August 2021, a student, M.M. ("Student 1"), filed a written complaint with Greig's office complaining that another student ("Student 2") used the word "Nigga" in her presence.

13. Student 1 and Student 2 were known to have a relationship that wavered between friendly and antagonistic, partly because of their involvement in Student Government.

14. Greig knew of the students' long history of interpersonal conflict.

15. Greig investigated Student 1's complaint, including researching Student 2's First Amendment rights, and sought guidance from the Texas A & M System's General Counsel and the Texas A & M System Title IX Coordinator.

16. Based on advice he received from both legal counsel and the Title IX Coordinator, as well as his own research, Greig decided that punishing Student 2 would violate her First Amendment rights and that she had not violated the Student Code of Conduct in effect at that time.

17. Instead, Greig counselled Student 2 on three separate occasions about how offensive the word she used was and advised her not to use the word again.

18. Student 1 was dissatisfied with Greig's handling of her complaint, so she spoke to Celeste McNiel, Defendant's Director of Student Life.

19. Dr. Emily Cutrer, Defendant's then-President, re-assigned the investigation of Student 1's complaint to Toney Favors, the Assistant Vice-President for Admissions and Recruiting, a position that effectively serves as the Director of Admissions.

20. Mr. Favors, however, is African-American.

21. Mr. Favors further re-assigned Student 1's complaint to Charlotte Banks, Defendant's Assistance Vice President and Chief Human Resources Officer.

22. Ms. Banks also is African-American.

23. Defendant did not assign the complaint to Celeste McNeil, a White female. Ms. NcNiel:

   a. was trained to perform investigations for Defendant,

   b. knew the students involved from her work with Defendant's Student Government,

   c. is familiar with Defendant's Maxient software, which Defendant used to perform intake, review, and storage of student complaints, and

   d. is the person who received the complaint from Student 1.

24. Ms. Banks conducted her own investigation into Student 1's complaint and ultimately reached the same conclusion as Greig.

25. In addition to assigning an African-American man to oversee an African-American woman to repeat Greig's investigation into Student 1's complaint, Defendant removed Greig from investigating any student complaint that involved race.

26. In the aftermath of Greig's decision not to discipline Student 2, Dr. Cutrer held a "Town Meeting."

27. At the Town Meeting, a faculty member stated that Defendant needed "a person of color" in the Student Affairs department.

28. As Defendant's President, Dr. Cutrer did not respond to the faculty member's statement.

29. Greig's supervisor also said Greig made the right decision not to punish Student 2.

30. Shortly thereafter, Greig's supervisor left Defendant's employ.

31. Defendant named Mr. Favors Acting Vice-President for Student Enrollment, Engagement and Success, which made Mr. Favors Greig's immediate supervisor.[1]

32. In March of 2022, Mr. Favors began to criticize Greig's job performance and alleged performance deficiencies, including incidents from several years prior and a list of complaints from students and employees.

33. Greig responded to the interim Vice President's allegations.

34. Afterward, Defendant never addressed these allegations with Greig.

35. In July 2022, for the first time in his twenty-five years of employment, Greig received a "not meeting expectations" rating on his yearly evaluation

36. Instead, Dr. Cutrer told Greig in August 2022 that he must resign or be terminated.

37. Greig's job duties included overseeing Defendant's on-campus housing for its students.

38. Prior to 2010, Defendant operated as a commuter school, where students did not live on-campus.

39. Beginning in 2010, Defendant opened its first residence hall, Bringle Lake Village.

---

[1] At various times, Mr. Favors listed his title as "Acting" and "Interim."

40. Bringle Lake Village is Defendant's only dormitory and was constructed to accommodate two hundred ninety-four beds.

41. Defendant has a stated intent to increase its enrollment, which averages approximately two thousand (2,000) students but now hovers near two thousand four hundred (2,400) students.

42. To increase its student population, Defendant consistently accepts students for admission even after the first day of classes.

43. Students are required to live on-campus during their first two (2) years of college unless they apply for and obtain a waiver of the on-campus residency requirement.

44. From 2010 to 2021, Defendant often received applications for on-campus housing that exceeded the number of beds in Defendant's only dormitory.

45. To accommodate the overflow of students in the dormitory, Defendant added beds to rooms, increasing the number of students per room.

46. Typically, by September 10 of each year, the number of students in Bringle Lake Village decreased to the planned occupancy through attrition, such as students not arriving and students withdrawing.

47. In the Spring of 2022, for the first time, Defendant noticed the number of students applying for on-campus housing for the 2022-23 academic year greatly exceeded housing capacity by such a number that attrition likely would not resolve the need for housing by September 10, 2022.

48. Defendant's unprecedented 2022 housing capacity problems were caused by an increase in enrollment for 2022, students who deferred going to college due to COVID-19, and students choosing to stay closer to home due to COVID-19.

49. Separately, Defendant ended its prior practice of increasing beds in Bringle Lake Village on the basis that the increased beds violated the Fire Code.

50. Due to the lack of additional beds and the increase in students in 2022, Defendant could not accommodate and assign all students to Bringle Lake Village for the upcoming year.

51. Despite the known lack of housing availability, Defendant continued to accept new students for the 2022-23 academic year, further exacerbating the housing problem.

52. To accommodate the overflow of students, Greig contacted area apartment complexes and hotels to find accommodations for the students.

53. Ultimately, Greig determined that the best option was to accommodate students in a local hotel.

54. Greig created a plan to accommodate the students and negotiated terms with the hotel.

55. Before the 2022-23 school year began, however, Defendant terminated Greig's employment.

56. For the 2023-24 academic year, Defendant anticipated the same housing problem and resolved that problem by advising upperclass students that they should identify substitute housing for the coming year.

57. For the 2024-25 academic year, Defendant again anticipated the same housing problem and resolved that problem by rescinding the prohibition on increasing the number of beds in Bringle Lake Village

58. Neither option used by Defendant for the 2023-24 or 2024-25 academic years was available to Greig during the unprecedented housing problem for the 2022-23 academic year.

59. Absent the lifting of the restriction on increasing the number of beds per room in Bringle Lake Village, Defendant would have had the exact same housing problem for the 2024-2025 academic year – two years after Plaintiff's termination.

F.  CONTESTED ISSUES OF FACT AND LAW

Contested issues of fact include:

1. Whether Plaintiff had received any non-favorable employment review prior to 2022;

2. Whether Plaintiff had any control over the supply of parts needed to repair the dorm elevator;

3. Whether Student 1 and Student 2 were good friends at the time of the incident leading to M.M.'s complaint about the use of the word "nigga;"

4. Whether Toney Favors' and Charlotte Banks' job duties included any authority or involvement with student complaints;

5. Whether Plaintiff's supervisor, Kathy Williams, the Vice President of Student Affairs, advised Plaintiff that he should consider looking for a new job because Defendant intended to blame Plaintiff for the race-related issues on campus after his failure to punish Student 2;

6. Whether Mr. Favors told Greig that the students wanted someone younger in Greig's position and that he felt Greig could not relate to people of color;

7. Whether Greig was given any guidance or goals to follow to improve his allegedly deficient performance.

8. Whether Defendant replaced Greig with a younger, African-American female.

9. Whether, after terminating Greig, Defendant implemented Greig's plan to accommodate Defendant's students.

10. Whether the housing shortage of 2022 was caused by Defendant's recruitment efforts;

11. Whether Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's termination and whether Defendant terminated Plaintiff because of his race.

Contested issues of law include whether (1) Defendant's reassignment of all race-based student complaints from Plaintiff and his White subordinate to Favors and Banks, who are both African-American constitutes a *per se* violation of Title VII and (2) Defendant has waived its affirmative defense of failure to mitigate damages.

G.  LIST OF WITNESSES

The parties will contemporaneously file their Witness Lists.

H.  LIST OF EXHIBITS

The parties will contemporaneously file their Exhibit Lists. *Parties will file a joint amended list following any further pre-trial rulings*

I.  LIST OF ANY PENDING MOTIONS

Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment are pending, ~~as are each of the parties' Motion in Limine~~.

J.  PROBABLE LENGTH OF TRIAL

The parties anticipate that trial will last approximately three days.

K.  MANAGEMENT CONFERENCE LIMITATIONS

None.

L.  CERTIFICATIONS

The undersigned counsel for each of the parties in this action do hereby certify and acknowledge the following:

(1)     Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

(2)     Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with;

(3)     Each exhibit in the List of Exhibits herein:

    (a)     is in existence;

    (b)     is numbered; and

    (c)     has been disclosed and shown to opposing counsel.

This Joint Pretrial Order is hereby approved this 3 day of February 2025.

United States ~~District Court~~ Magistrate Judge

Approved as to form and substance:

Michael E. Coles
mikec@colesfirm.com
**THE COLES FIRM**
8080 N. Central Expy., Suite 1700
Dallas, Texas 75206
(214) 443-7860 (Telephone)

and

**THE LAMBERSON LAW FIRM PC**
6333 E. Mockingbird Ln., Suite 147-524
Dallas, Texas 75214
(214) 288-2443 (Telephone)

By: _/s/ Elizabeth Lamberson_
Elizabeth Lamberson
State Bar No. 24027044
lizl@colesfirm.com

ATTORNEYS FOR PLAINTFF CARL GREIG


_/s/ Kelsey L. Warren_
**KELSEY L. WARREN**
Assistant Attorney General
Texas Bar No. 24095736
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
kelsey.warren@oag.texas.gov

**ATTORNEY FOR DEFENDANTS TAMUT**