**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| CARL GREIG | § | |
| | § | |
| v. | § | Case No. 5:23-CV-00030-JRG-JBB |
| | § | |
| TEXAS A&M UNIVERSITY TEXARKANA | § | |

---

<u>**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**</u>

---

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following motions are before the Court:

**Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 32); and**

**Defendant's Motion for Summary Judgment (Dkt. No. 33).**

The Court, having reviewed the relevant briefing, recommends the motions be **DENIED**.

## I. BACKGROUND

Plaintiff Carl Greig ("Greig") brings this employment discrimination lawsuit against Defendant Texas A&M University Texarkana ("TAMUT"). In his amended complaint, Greig alleges he is a white male who worked for TAMUT for approximately twenty-five years, most recently as the Assistant Vice President of Student Affairs. Dkt. No. 11, ¶ 7. According to Greig, part of his job duties included investigating student complaints about other students' violations of TAMUT's Code of Conduct and other offensive behavior. *Id*., ¶ 8. Greig alleges he was discriminated against on the basis of race based on a single incident where he investigated, but did not discipline, a student who used a negative racial epithet. *Id*., ¶¶ 9-10. Greig alleges TAMUT began reducing his job duties following the Human Resource Director's investigation of the

incident and removed Greig from investigating any student complaints that involved race; thereafter, in August 2022, Greig was forced to resign in lieu of termination. *Id.*, ¶¶ 11, 14, 17. According to Greig, he was replaced by an African-American female. *Id.*, ¶ 15. Greig alleges TAMUT discriminated against him on the basis of race in violation of Title VII by removing his job responsibilities and ultimately terminating his employment. *Id.*, ¶¶ 16-18. Greig seeks back and front pay, compensatory damages, and reasonable attorneys' fees.

## II. SUMMARY JUDGMENT MOTIONS

In his motion for partial summary judgment, Greig argues TAMUT's reassignment of all race-based student complaints from Greig (and his white subordinate) to two African-American employees constitutes *per se* discrimination under Title VII, and the Court should enter summary judgment in Greig's favor to that effect. Dkt. No. 32 at 1-2; Dkt. No. 50 at 9. In its motion for summary judgment, TAMUT asserts Greig fails to show sufficient facts to establish a disparate treatment claim under Title VII. Dkt. No. 33 at 7-11. According to TAMUT, Greig's Title VII claim fails because Greig fails to show the *prima facie* element of a similarly situated comparator. *Id.* at 11-14. In response, Greig asserts he has adduced direct evidence of TAMUT's intent to discriminate against Greig when it reassigned his job duties and ultimately terminated his employment. Dkt. No. 35 at 1. Alternatively, Greig contends he has adduced sufficient evidence to satisfy his initial obligation under *McDonnell Douglas* and to allow a reasonable jury to conclude that the reasons TAMUT proffers for these adverse employment actions are pretext for race discrimination. *Id.*

## III. LEGAL STANDARDS

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper

if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." *Mission Pharmacal Co. v. Virtus Pharm., L.L.C.*, 23 F. Supp. 3d 748, 756-57 (W.D. Tex. 2014) (quoting FED. R. CIV. P. 56(c)(3)). The court must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

### IV. SUMMARY JUDGMENT EVIDENCE

#### A.    Parties' evidence

TAMUT attached the following to its motion for summary judgment: (1) Greig's Charge of Discrimination ("Def. Ex. A"); (2) Memorandum dated 10/21/21 Re: Complaint Dated August 30, 2021 ("Def. Ex. B"); (3) Internal reports Re: Complaint No. TAMUT22-0020 ("Def. Ex. C"); (4) Excerpts of the October 16, 2024 deposition of Carl Greig ("Greig Dep."); and (5) Excerpts of the October 23, 2024 deposition of TAMUT as presented by Charlotte Banks ("TAMUT First Dep."). Greig relies on the following evidence in his response: (1) Excerpts from the Greig Dep.; (2)  Excerpts from the TAMUT First Dep.; (3) Plaintiff's First Amended Complaint ("FAC"); (4) Declaration of Kathy Williams ("Williams Decl."); and (5) Declaration of Carl Greig ("Greig Decl."). In support of his motion for partial summary judgment, Greig attaches excepts from

Greig's deposition and the deposition of TAMUT as presented by Charlotte Banks, as well as Williams' Declaration. Additionally, Greig relies on excerpts from the November 12, 2024 deposition of TAMUT as presented by Celeste McNiel ("TAMUT Second Dep.").

**B.    Evidentiary issues**

Greig raises two evidentiary issues in his response. First, Greig asserts TAMUT has not answered Greig's FAC, and thus the Court must accept the facts asserted therein as true. Dkt. No. 35 at 2 n. 1 (citing FED. R. CIV. P. 8(b)(6)). That is correct. Federal Rule of Civil Procedure 8(b)(6) provides that an allegation that requires a responsive pleading, other than an allegation relating to the amount of damages, is deemed admitted if not denied. *United States ex rel. Proctor v. Next Health L.L.C.*, No. 4:17-CV-00169-ALM-BD, 2024 WL 4964504, at *3 (E.D. Tex. Nov. 14, 2024), *report and recommendation adopted*, 2024 WL 4953801 (E.D. Tex. Dec. 3, 2024). Following the Court's denial of TAMUT's motion to dismiss Greig's FAC, TAMUT failed to file an answer to the amended complaint. It therefore failed to deny any of the factual allegations against it. Indeed, many of the material facts set out below are listed in the parties' recently-filed Joint Pretrial Order as "stipulations and uncontested facts." *See* Dkt. No. 59 at 2-8 (hereafter, "Stipulation(s)").

Second, Greig objects to TAMUT's Exhibits B and C, which consist of a series of emails between TAMUT's Human Resources Department and upper management regarding various issues with Greig's job performance.[1] Greig claims the documents are inadmissible because they are not authenticated and they are hearsay. Dkt. No. 35 at 2. TAMUT claims the emails were produced in discovery by TAMUT and are "self-authenticating under [Federal Rule of Evidence] 902(11)." Dkt. No. 39 at 3-4 (citing, among other cases, *Gary v. Combined Grp. Ins. Servs., Inc.*,

---

[1] Exhibit B contains, among other things, a redacted copy of Charlotte Banks' 10/21/2021 Memorandum regarding the investigation into Student 1's complaint. Greig has attached an unredacted copy of the same Memorandum as an exhibit to his motion for partial summary judgment. Dkt. No. 32-2. Exhibit C contains numerous witness statements, TAMUT internal emails, and copies of Greig's performance reviews.

No. 3:08-CV-228-L, 2009 WL 2868485, at *6 (N.D. Tex. Sept. 4, 2009) ("Because [the exhibits] have distinctive e-mail characteristics and because Plaintiff has stated in her affidavit that she wrote and sent these emails, the Court finds that they meet the threshold for authentication for summary judgment purposes")). The Court declines to strike Exhibits B and C at this time and considers them for the purpose of summary judgment.[2]

## C.    Material facts

### 1.    Background

TAMUT is a public state university system and is part of the Texas A & M System, which is based in College Station, Texas. FAC, ¶ 2, Stipulation 1. Greig is a white male. Greig Decl. at 1; Stipulation 2. Greig worked for TAMUT in various student support roles for approximately twenty-five years. Greig Decl. at 1; Stipulation 3; Greig Dep. at 50:12–53:8. According to Greig, during his employment, he received awards, including Administrator of the Year Award, and he received favorable reviews until July 2022.[3] Greig Decl. at 1; Greig Dep. at 59:4-11; TAMUT First Dep. at 16:13-31:12; Williams Decl., ¶ 6 ("Until my resignation in March 2022, I considered Mr. Greig to be capable and competent in his work and an asset to Texas A & M – Texarkana."). Prior to July 2022, Greig had never been disciplined, and he alleges TAMUT never told him that his overall job performance fell below acceptable standards. Greig Dep. at 62:6-14, 63:16–64:3. Greig's last position with TAMUT was Assistant Vice President of Student Affairs/Dean of Students. Greig Decl., ¶ 2.

---

[2] The undersigned ruled at the pretrial conference that such self-authored, internal emails, notes, and memos will not be preadmitted exhibits that go to the jury room but instead may be used to refresh recollection under F.R.E. 830(5) or for impeachment, as appropriate.

[3] The parties dispute whether Greig received any non-favorable employment review prior to 2022. Dkt. No. 50 at 8. In one evaluation, Greig's manager at the time, Kathy Williams, indicated Greig "Meets expectations. Would like to see you do more to hold Joe [Sloan who reported to Greig] accountable for his mediocre performance." TAMUT First Dep. at 18:22-24, 23:11-17; *see also id.* at 24:2-15 (stating that it is a "culture in our university" from an HR perspective that "meets expectations" is an indication that "there may be some performance issues").

Kathy Williams served as the Vice President of Student Enrollment, Engagement & Success from September 2016 until she resigned from her position in March 2022. Williams Decl., ¶ 3. During that time, Williams oversaw student services and supervised Greig and Toney Favors. *Id.*

## 2. Greig's job duties

As Assistant Vice President of Student Affairs/Dean of Students, Greig was responsible for on-campus student housing. As part of her role as supervisor, Williams received weekly reports from Greig detailing pending requests for on-campus housing. Williams Decl., ¶ 4. When she received those weekly reports from Greig, Williams forwarded them to the President's Advisory Committee.[4] *Id.*, ¶ 5.

Greig's job duties also included investigating student complaints about other students' violations of TAMUT's Code of Conduct and other offensive behavior. Greig Decl., ¶ 3; Greig Dep. at 31:14-32:17; Stipulation 4. In certain instances, allegations related to student misconduct implicated Title IX of the Education Amendments of 1972, now known as the Patsy Mink Equal Opportunity in Education Act. Greig Dep. at 30:17 – 30:24; TAMUT Second Dep. at 162:1 – 163:23; Stipulation 5. Because TAMUT existed as part of the Texas A & M System, Greig sought and received guidance from Richard Olshak, the Texas A & M System Title IX Coordinator, based in College Station, Texas. Stipulation 6. Mr. Olshak provided guidance related to Title IX investigations. *Id.*; Greig Decl., ¶ 5.

---

[4] During discovery in this case, TAMUT represented it does not generate "weekly housing reports" and thus had no responsive documents to Greig's request for emails between Greig and Williams with the subject line "Weekly Housing Report." *See* Dkt. No. 46-2.

### 3.      Greig's investigation of Student 1's complaint

In August 2021, a student, M.M. ("Student 1"), filed a written complaint with Greig's office complaining that another student, Y.Z. ("Student 2"), used the word "Nigga" in her presence while on a trip to the mall several months earlier in the spring of 2021 (approximately mid-February). Greig Dep. at 79:3-80:8; TAMUT First Dep., Ex. 8; *see also* Stipulation 12. According to Greig's declaration, at the time the offensive word was used, the students were good friends and Student 1 did not complain that she was offended by Student 2's statement. Greig Decl., ¶ 6. Student 1 and Student 2 were known to have a relationship that wavered between friendly and antagonistic, partly because of their involvement in Student Government. *Id.*, ¶ 7; *see also* TAMUT Second Dep. at 211:7, 14-16 (stating that Student 1 and Student 2 had "very open, public feuds" and a "kind of hot and cold" friendship which deteriorated significantly after the incident); Stipulation 13. At the time of the incident, Greig knew of the students' long history of interpersonal conflict. Greig Decl., ¶ 7; Stipulation 14.

Greig investigated Student 1's complaint, including researching Student 2's First Amendment rights, and sought guidance from the Texas A & M System's General Counsel and the Texas A & M System Title IX Coordinator. Greig Decl., ¶ 8; Stipulation 15.  Based on advice he received from both legal counsel and the Title IX Coordinator, as well as his own research, Greig decided that punishing Student 2 would violate her First Amendment rights and that she had not violated the Student Code of Conduct in effect at that time. Greig Decl., ¶ 9; Stipulation 16. Rather than issue an official sanction, Greig counselled Student 2 on three separate occasions about how offensive the word she used was and advised her not to use the word again. Greig Decl., ¶ 10; Stipulation 17.

Student 1 was dissatisfied with Greig's handling of her complaint so she spoke with Celeste McNiel, Director of Student Life. TAMUT Second Dep. at 195:12-22; *see also* Stipulation 18. As TAMUT's representative, McNiel testified that Student 1's complaint created "significant uproar" among the students and the Student Life or Residential Life Department. TAMUT Second Dep. at 194:21-195:9.

**4.     Reassignment of investigations of racial complaints, including Student 1's complaint**

In the aftermath of Greig's decision not to discipline Student 2, Dr. Emily Cutrer, TAMUT's then-President, held a "Town Meeting." TAMUT Second Dep. at 211:22-212:1; Stipulations 19, 26. At the Town Meeting, a faculty member stated that TAMUT needed "a person of color" in the Student Affairs department. TAMUT Second Dep. at 212:18-214:1; Stipulation 27. As TAMUT's President, Dr. Cutrer did not address or otherwise reject the faculty member's statement. TAMUT Second Dep. at 213:21-214:1 (stating "she did not say anything to deflect it"); Stipulation 28.

At some point around this time, TAMUT removed Greig from investigating any student complaint that involved race. Stipulation 25. TAMUT assigned the investigation of racial complaints to Toney Favors (acting VP at the time) and Charlotte Banks (senior-most human resources personnel for TAMUT at the time), both of whom are African-American. TAMUT First Dep. at 33:5-38:9; Stipulations 19-22. Banks testified McNiel (a white female) was also involved in some investigations. TAMUT First Dep. at 37:17-18; TAMUT Second Dep. at 147:12-14. According to McNiel, however, she was told to start sending any complaints relating to race or discrimination to the Chief of Staff who would then give them to Favors. TAMUT Second Dep. at 189:15-20.

Regarding Student 1's specific complaint, Dr. Cutrer reassigned its investigation to Favors, the Assistant Vice-President for Admissions and Recruiting, a position that effectively serves as

the Director of Admissions. Stipulation 19. Favors further reassigned Student 1's complaint to Banks, TAMUT's Assistance Vice President and Chief Human Resources Officer. Stipulation 21. TAMUT did not assign the complaint to McNiel. Stipulation 23; *see also* TAMUT Second Dep. at 188:3-9, 190:14-25.

**5.      Banks' investigation into Student 1's complaint**

Regarding the assignment, Banks had discussions with her boss (Jeff Hinton), Favors (who was at the same level as Jeff Hinton), and possibly Dr. Cutrer. TAMUT First Dep. at 27:2-3, 34:7-9, 36:1-2, 18. Banks was told that she "was going to need to get involved in investigating a plethora of student complaints involving racial incidents on campus and that [Greig] wouldn't be doing it." *Id.* at 34:1-5. Thereafter, Banks handled investigations that involved several interviews, including the one involving Student 1's complaint. *Id.* at 36:12-15.

Banks conducted her own investigation into Student 1's complaint and ultimately reached the same conclusion as Greig. *Id.* at 50:2-52:25, 122:16-123:17; Stipulation 24. In a Memorandum to Favors dated October 21, 2021 (TAMUT Dep., Ex. 8), Banks provided the details of her investigation, which are as follows:

Student 1 complained about Student 2's use of offensive language in mid-February 2021. TAMUT First Dep., Ex. 8 at 1. Student 1 was told by Greig that Student 2's use of the word was free speech, and that because it did not violate the Student Code of Conduct there was nothing that could be done. *Id*. Student 1 requested, as relief, that Student 2 be removed from her position in the Student Government Association; all TAMUT students be required to attend mandatory diversity/sensitivity training; and greater transparency regarding student sanctions to discourage future behavior and better ensure equitable treatment. *Id*.

As part of her investigation, Banks met with Student 1, Student 2, Greig, and four student witnesses. She also reviewed TAMUT Offense Report (# TAMUT-21-0038), a September 29, 2021 email and attachments from Student 1, and an October 11, 2021 email from Greig. *Id.* at 1-2. Student 1 stated her verbal complaint to Greig was made sometime between the end of March through May of 2021, and "she felt that the complaint was not taken seriously and/or no sanctions were implemented." *Id.* at 3. Greig stated the verbal complaint was not reported until August of 2021. *Id.* Student 2 submitted a complaint to the university police department on September 21, 2021, alleging Student 1 was threatening to "beat her ass." *Id.*

Banks considered two questions during her investigation: (1) did Student 2 use the word in the presence of Student 1 during the Spring of 2021 (approximately mid-February)? and (2) did Greig tell Student 1 that Student 2's use of the word was free speech, and it does not violate the Student Code of Conduct? *Id.* at 3-5. Regarding the first question, Banks stated that Student 2, while at the mall, used the word to refer to an unknown African-American male. *Id.* at 3. Although offended by the use of the word, Student 1 did not believe Student 2 used the word in a hateful manner. *Id.* Student 2 stated that she did not see Student 1 at the mall during the Spring semester of 2021 and did not remember if she ever used the word in the presence of Student 1. *Id.* However, Student 2 acknowledged having used the word in the past and stated she had been counseled by Greig in August 2021 and had "stopped using the word." *Id.* Two witnesses stated they had witnessed Student 2 using the word during the fall of 2019 and 2020. Greig stated Student 2 admitted to using the word in Student 1's presence at the mall, and "he had counseled her regarding the use of the word." *Id.* Based on the above, Banks concluded the allegation was substantiated. *Id.*

Regarding the second question, Banks noted Greig's belief that Student 2's use of the word did not violate the Student Code of Conduct because it was free speech and there was no connection made to Student 2's use of the word creating or perpetuating a hostile, offensive, and/or disrespectful environment that violated the Student Rights and Obligations section of the Student Code of Conduct. *Id.* at 4. Banks concluded the second question was also substantiated. *Id.* at 5. In conclusion, Banks recommended all residential students, student athletes, and student organization members/leaders, at a minimum, be required to attend some form of mandatory diversity/sensitivity training and that the Student Code of Conduct be revised to include specific sanctions addressing "hate speech, race-based bias, offensive language, and harassment." *Id.*

**6.    Greig's job performance review from new supervisor Favors**

Greig and his former supervisor, Kathy Williams (the former Vice President of Student Affairs), submitted affidavits stating that in November 2021 Williams advised Greig that he should consider looking for a new job because TAMUT intended to blame Greig for the race-related issues on campus after his failure to punish Student 2. Williams Decl., ¶ 7; Greig Decl., ¶ 11. Williams also said Greig made the right decision not to punish Student 2. Greig Decl., ¶ 11; Stipulation 29. Shortly thereafter, Williams left TAMUT's employ. Greig Dep. at 93:23 – 94:14; Williams Decl., ¶ 3; Greig Decl., ¶ 11; Stipulation 30. When she resigned from her position, Williams told Greig that she believed the "University President would target him for termination." Williams Decl., ¶ 7.

TAMUT named Favors Acting Vice-President for Student Enrollment, Engagement, and Success, which made Favors Greig's immediate supervisor.[5] Greig Decl., ¶ 12; TAMUT Second Dep. at 93:20-94:14; Stipulation 31. In March 2022, Favors began criticized Greig's job performance and alleged performance deficiencies, including incidents from several years prior

---

[5] At various times, Favors listed his title as "Acting" and "Interim."

and a list of complaints from students and employees. Greig Decl., ¶ 13; Stipulation 32. Greig responded to the interim Vice President's allegations. Greig Decl., ¶ 13; Stipulation 33. Afterward, TAMUT never addressed these allegations with Greig. Greig Decl., ¶ 14; Stipulation 34.

In July 2022, for the first time in his twenty-five years of employment, Greig received a "not meeting expectations" rating on his yearly evaluation. Greig Decl., ¶ 15; Stipulation 35. Greig alleges that Favors told him that the students wanted someone younger in Greig's position and that he felt Greig could not relate to people of color. Greig Decl., ¶ 16. Greig also alleges he was given no guidance or goals to follow to improve his allegedly deficient performance. Greig Decl., ¶ 17; TAMUT First Dep. at 126:7-20; TAMUT Second Dep. at 206:18-207:5.

**7.    Greig's alleged job deficiencies**

**a.    Failure to address student conduct complaints and lack of documentation**

According to Banks, Dr. Cutrer removed a significant amount of duties from Greig's role "due to nonperformance." TAMUT First Dep. at 26:18-22. Following Greig's failure to discipline Student 2 following his investigation of Student 1's complaint, some students, frustrated with Greig's response, began bypassing the university reporting system all together and reporting incidents of hate speech to the campus police instead of Greig. *Id.* at 34:10-22 (Banks stating her boss told her that students were not going to Student Life but were instead going to law enforcement to report non-law enforcement related matters on campus).

There "was a group of students who didn't want to go to [Greig] for their complaints" because "there weren't any sanctions in other cases." TAMUT Second Dep. at 189:20-191:11. According to McNiel, there were seven or eight race complaints from August 2021 to July 2022, which was higher than historical norms and possibly attributable to the rise and prominence of the

Black Lives Matter movement at about that same time; several of those cases related to Student 1's complaint in some way. *Id.* at 188:10-189:6, 195:7-9.

In Favors' 2021 evaluation of Greig, under "Diversity & Respect," Favors rated Greig as "Partially Meet Expectations." Def. Ex. C at TAMU-000197. Favors noted that Greig wanted to show fairness in his role; however, Favors found Greig was "lacking in the area of fostering and leading in an open & inclusive conversation where employees and students believe you understand their concerns and work diligently to resolve it." *Id.* Favors further noted Greig's challenges with A.L. (one of TAMUT's students with disability discussed below) and particularly with "students of color with issues on diversity," explaining that students in general believe that Greig was not attentive to their issues. *Id.*

Additionally, Favors highlighted that Greig's "lack of documentation" regarding investigation of complaints places TAMUT at risk. *Id.* at TAMU-000198. For compliance purposes, TAMUT is required to document and maintain records related to its investigations of student complaints, particularly when related to alleged violations of state or federal law, including anti-discrimination laws. Stipulation 7. TAMUT documentation suggests Greig did not generate notes or other documentation from what he characterized as "informal" investigations. Def. Ex. C at TAMU-000177. Banks testified there were "reports from Greig's area" that while Greig talked to people, "there was never any documentation of what had occurred, what had been done regarding the investigation, what the outcome was." TAMUT First Dep. at 34:23-35:1.

**b.    Failure to properly address ADA requests**

Greig's job duties also included overseeing TAMUT's on-campus housing for its students. Stipulation 37. A student who was disabled and required an ADA-accessible room filed a complaint that the elevator she needed to use was broken. Def. Ex. C at TAMU 000191-000194.

Greig investigated the complaint concerning her dorm accommodations. Stipulation 8; TAMUT Second Dep. at 201:15-25. The elevator in the dorm had been broken for some time, so Greig arranged for the student to move to a first-floor room. But the laundry facilities were located on the second and third floors, so Greig arranged for the student to access other, accessible laundry facilities. Stipulation 9; *see also* TAMUT Second Dep. at 202:1-6. The parts needed to repair the elevator were not available due to Covid-related supply chain issues. Stipulation 10; *see also* TAMUT Second Dep. at 203:6-15. TAMUT conceded that Greig had no "failures or shortcomings" with respect to this student's complaint. TAMUT Second Dep. at 204:17-21; Stipulation 11.

On June 7, 2022, Favors sent Greig an email regarding "Complaints and Feedback." Ex. C at TAMU-000187-000194. In the lengthy email, under a section labeled "Lack of Support," Favors asked for Greig's feedback on various issues, including the disabled student's complaints regarding the broken elevator and her inability to stay in an ADA room. *Id.* at TAMU-000193. According to the email, the disabled student had reported that Greig was not friendly and only moved to resolve the issue with the broken elevator when the student reported it to others. *Id.* at TAMU-000192. The student complained that TAMUT needed a better Disability Coordinator because Greig "does not care for the students" and "is not the right fit for this position." *Id.*

According to the email, McNiel reported to Favors that after the student met with McNiel to discuss accommodations and the broken elevator, someone [redacted] reported to the student that Greig asked "what [the student] wanted him to do with the complaint she submitted." *Id.* at TAMU-000192-000193. The student "was shocked and uncomfortable because she didn't know that the complaint form went to" Greig. *Id.* at TAMU-000193. The student told McNiel that she felt Greig did not take her requests/condition seriously because she is able to walk at times. *Id.* According to

McNiel, the student requested that the meeting be recorded, and she mentioned at least once "that she could sue." *Id.*

## 8.    Greig's ultimate termination

In a July 27, 2022 Memorandum from Favors to Dr. Cutrer, Favors requested approval for termination of employment, listing the following "ongoing performance issues and low student/staff confidence" in Greig:

- Excessive student complaints consistent in scope and content regarding poor responses/no responses to student issues/complaints
- Consistent lack of documentation regarding investigations
- Student complainants who refuse to route complaints through his office, which places a greater burden on other departments to document and investigate student complaints
- Demonstrated lack of trust among direct reports, students, and other staff
- Significant student complaints involving diversity and equity issues
- Ongoing issues with the complaint submittal process, BLV and Title IX action plans, transportation issues for students, and opportunities for improved student awareness, etc.
- Lack of appropriate intervention regarding the management situation at the Patterson Student Center

Def. Ex. C at TAMU-000206.

Dr. Cutrer told Greig in August 2022 that he must resign or be terminated. Stipulation 36. TAMUT replaced Greig with a younger, African-American female. TAMUT First Dep. at 83:23-84:9.

## V. APPLICABLE LAW

Title VII of the Civil Rights Act of 1964 prohibits an employer from "fail[ing] to or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Daywalker v. UTMB at Galveston*, No. 22-40813, 2024 WL 94297, at *7 (5th Cir. Jan. 19, 2024) (citing 42 U.S.C. §

2000e–2(a)(1)). The Fifth Circuit has recently made clear that a plaintiff is not required to suffer a permanent adverse employment decision to maintain a Title VII claim. *Id.* (citing *Hamilton v. Dallas County*, 79 F.4th 494, 502 (5th Cir. 2023) (en banc)). A Title VII plaintiff may make out a prima facie case of discrimination using either direct or circumstantial evidence. *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 475 (5th Cir. 2015), *as revised* (Feb. 3, 2015) (citing *Portis v. First Nat'l Bank*, 34 F.3d 325, 328 (5th Cir.1994)).

When a plaintiff relies on circumstantial evidence to prove his Title VII discrimination case, the *McDonnell Douglas* burden-shifting framework applies. *Shahrashoob v. Texas A&M Univ.*, 125 F.4th 641, 648–49 (5th Cir. 2025) (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973))). Under this framework, the plaintiff bears the initial burden of making out a prima facie case. *Id.* at 649. If successful, "the burden of production shifts to [the defendant] to proffer a legitimate, nondiscriminatory reason for [its] action." *Ibanez v. Texas A&M Univ. Kingsville*, 118 F.4th 677, 682–83 (5th Cir. 2024) (quoting *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021)). If the defendant meets that burden, "the presumption of discrimination disappears," and the plaintiff must produce substantial evidence indicating that the defendant's proffered reason is pretext for discrimination. *Id.* (citing *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011); also citing *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016)).

## VI.  DISCUSSION

### A.    Greig's motion for partial summary judgment

Greig asserts TAMUT's reassignment of all race-based student complaints from Greig and his subordinate Celeste McNiel (both of whom are white) to Favors and Banks (both of whom are African-American), who were allegedly less qualified than Greig and McNiel, constitutes a *per se*

violation of Title VII. Dkt. No. 32 at 6-8; *see also* Dkt. No. 38 at 2, 5. According to Greig, the "narrow issue" presented is "that race-related complaints were removed from the purview of the two White employees who had been specifically trained to do these investigations and instead assigned to two African-American employees with no special training and whose department was not responsible for student oversight." Dkt. No. 38 at 1-2, 5.

In response, TAMUT asserts Greig has not demonstrated that his race is the reason he was terminated or given less responsibility with student complaints. Dkt. No. 36 at 8. TAMUT states the reassignment was because Greig was "nonresponsive," and the discharge was "due to his inability to address the concerns of Black students when they felt threatened—threatened enough to go to the police and file reports." *Id.* at 9 (arguing Greig "ignored" the complaints and "was unable to see past the assaulting words to the intent behind them and identify a possible on-campus threat"). TAMUT does not address the specific issue of whether Favors and Banks, as opposed to Greig and McNiel, had sufficient training or authority for student oversight/investigations.

Greig's summary judgment evidence shows that (1) Greig and McNiel both worked in the Student Affairs department, (2) both were trained to conduct Title IX investigations, and (3) both had been tasked with responsibility for investigating student complaints, including those involving race. Following Greig's failure to discipline Student 2 after investigating Student 1's complaint, TAMUT made the decision to reassign all race-related complaints to someone other than Greig. However, TAMUT did not reassign those complaints to McNiel, who was trained in and previously had been tasked with these types of complaints. Stipulation 23. Rather, TAMUT reassigned all race-related complaints to Favors and Banks. Banks was told that she "was going to need to get involved in investigating a plethora of student complaints involving racial incidents on campus and that [Greig] wouldn't be doing it." TAMUT First Dep. at 34:1-5. McNiel was also told to start

sending any complaints relating to race or discrimination to the Chief of Staff who would then give them to Favors. TAMUT Second Dep. at 189:15-20.

Greig contends Favors' and Banks' job duties had never previously involved student complaints or student life, and in the case of Favors, he "had no known training or experience in conducting investigations of any kind." Dkt. No. 32 at 8. According to Greig, this, combined with TAMUT's President's "failure to disavow a faculty demand that a person of color be placed as an administrator in the department overseeing such claims, completely undercuts any claim [TAMUT] may have that it assigned these claims to Mr. Favors and Ms. Banks for any reason other than discrimination." *Id.*

As an initial matter, TAMUT has marshaled sufficient evidence for a jury to find the reassignment of race-related complaints concerned Greig's performance, rather than his race. *See, e.g.*, TAMUT First Dep. at 26:18-22 (Banks stating that Dr. Cutrer removed a significant amount of duties from Greig's role "due to nonperformance"). Further, there are factual disputes concerning Favors' and Banks' qualifications. As noted above, TAMUT's response does not address the specific issue of Favors' and Banks' training and authority regarding student complaints. However, according to the Joint Pretrial Order, the parties dispute whether Favors' and Banks' job duties included any authority or involvement with student complaints. Dkt. No. 59 at 8.

Considering all of the evidence relied upon by the parties in the briefing regarding their cross motions in the light most favorable to TAMUT as the nonmovant, there is sufficient evidence to create a genuine issue of material fact regarding Favors' and Banks' qualifications. For example, although Greig testified Banks' role had no authority over or involvement with student complaints, Greig Dep. at 33:10-17, Banks testified she had the "position" and "experience" to investigate

complaints. TAMUT First Dep. at 33:5-21, 38:4-7. Banks further testified she was a deputy Title IX officer with investigations experience and training. *Id.* at 35:6-12, 48:7-13 (referencing Title IX training "and other investigative trainings" that she has had). Banks' testimony also suggests that Favors had some experience doing investigations, just not as much experience as Banks. *See id.* at 36:1-12 (stating Favors did not have as much experience doing investigations as Banks so Favors handled the basic investigations involving only one or two people). In sum, the Court is unpersuaded that the evidence of record regarding Banks' and Favors' qualifications and training (or lack thereof), even when combined with Dr. Cutrer's "failure to disavow a faculty demand that a person of color be placed as an administrator in the department overseeing such claims," Dkt. No. 32 at 8, demonstrates the absence of a genuine issue of material fact as to whether TAMUT's reassignment of the race-based claims to Favors and Banks was a *per se* violation of Title VII.

Greig's reliance on an out-of-circuit case *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468 (11th Cir. 1999), does not change the result. There, a telemarketing firm (TPG) had been hired to make pre-election "get-out-the-vote" calls on behalf of various political candidates, and approximately 10% of that calling was race-matched, such that black voters were called by black TPG employees who used the "black" script and white voters were called by white TPG employees who used a different, "white" script. *Id.* at 471. To facilitate supervision, the company even segregated black callers in one room and white callers in another room. *Id.* Ferrill, an African-American woman who was hired as a temporary employee to fill TPG's pre-election staffing needs, made race-matched "get-out-the-vote" calls and was then laid off immediately after the election. *Id.* She filed a race discrimination action under 42 U.S.C. § 1981. *Id.* at 471-72. Notably, TPG admitted that the 1994 assignments of "get-out-the-vote" calls and scripts were made on the basis of race and that TPG employees were segregated on the basis of race. *Id.* at 472. TPG's admission was "direct

evidence of disparate treatment on the basis of race and sustain[ed] Ferrill's prima facie case." *Id.*
The Eleventh Circuit ruled that TPG could be held liable for making race-based job assignments.

*Ferrill* is distinguishable for at least two reasons. First, the defendant made certain admissions that are not present here. Whereas there was direct evidence of disparate treatment on the basis of race, TAMUT has not made admissions which equate to direct evidence of disparate treatment on the basis of race, but in fact contends the opposite. Second, the defendant in *Ferrill* had an overt policy of segregating employees by race. Here, there is testimony that in addition to Banks and Favors, there were some white employees who also conducted race-based investigations. Banks testified that McNiel, and another "White American" lady that worked for Banks, were involved in some investigations. TAMUT First Dep. at 37:17-38:7.

The undersigned recommends that Greig's motion for partial summary judgment—on the narrow issue of whether TAMUT's reassignment of race-based investigations to Favors and Banks constitutes a *per se* violation of Title VII—be denied.

## B.    TAMUT's motion for summary judgment

TAMUT asserts the Court must dismiss Greig's lawsuit as a matter of law because Greig fails to bring a viable claim for race discrimination under Title VII. Dkt. No. 33 at 14. TAMUT argues Greig fails to marshal sufficient facts to establish a prima facie of disparate treatment. *Id.* at 7-14.  Viewing the evidence in the light most favorable to Greig, TAMUT's motion must be denied.

### 1.    Direct evidence

Greig first contends he need not show a prima facie case because he has direct evidence of discrimination. Dkt. No. 35 at 1, 15. The direct evidence includes the following: (1) TAMUT's President failed to disavow a faculty member's statement in a meeting that a "person of color"

should be given Greig's job; (2) Favors told Greig that he did not believe that Greig could connect

with persons of color; and (3) "all race-related complaints were assigned to two African-American

employees with no special training in these types of investigations and whose job duties did not

include interfacing with students, even though a White employee who *was* trained and whose

position *did* involve interfacing with students was available to perform the investigations." Dkt.

No. 38 at 3-4 (emphasis original). Thus, according to Greig, he has met his initial burden, and the

Court does not need to apply the *McDonnell Douglas* burden-shifting framework applicable to

circumstantial evidence. *Id*.

Direct evidence is rare. *Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 328

(5th Cir. 1994), *as amended on denial of reh'g* (Nov. 10, 1994). "Direct evidence is evidence

which, if believed, proves the fact [of intentional discrimination] without inference or

presumption." *Id*. at 328-29 (citation omitted). "In the context of Title VII, direct evidence includes

any statement or written document showing a discriminatory motive on its face." *Herster v. Bd. of

Supervisors of Louisiana State Univ*., 887 F.3d 177, 185 (5th Cir. 2018) (quoting *Portis*, 34 F.3d

at 329). "A statement or document which shows on its face that an improper criterion served as a

basis—not necessarily the sole basis, but a basis—for the adverse employment action is direct

evidence of discrimination." *Reyna*, 2025 WL 317568, at *7 (quoting *Price v. Valvoline, L.L.C*.,

88 F.4th 1062, 1065 (5th Cir. 2023) (cleaned up in *Reyna*)). The ultimate focus is on whether the

comments prove, "without inference or presumption, that race was a basis in employment

decisions" in the plaintiff's workplace. *Etienne*, 778 F.3d at 476 (quoting *Jones v. Robinson Prop.

Group, L.P*., 427 F.3d 987, 993 (5th Cir. 2005)). "Statements that do not meet this standard without

inference or presumption are considered only 'stray remarks.'"[6] *Reyna*, 2025 WL 317568, at *7 (quoting *Price*, 88 F.4th at 1065).

Here, Greig points to one affirmative statement, which TAMUT contests (*see* Dkt. No. 59 at 8): that Favors, after assuming the role of Interim Vice President of Student Affairs in March 2022, told Greig that he felt Greig could not relate to people of color. According to TAMUT, this "statement alone would readily be understood as a communication of a serious performance issue, given Plaintiff was responsible for investigating student complaints relating to race and such investigations necessarily involve a degree of interpersonal skill." Dkt. No. 39 at 6. This statement does not show on its face that race served as a basis for the adverse employment action(s) made at TAMUT with regard to Greig. Even considering the proximity to the ultimate termination, an inference or presumption is required to get from this statement to the conclusion that Greig could not relate to people of color because he is white.

Neither Dr. Cutrer's failure to "disavow" a faculty member's statement in a meeting that "a person of color" was needed in the Student Affairs Department nor her reassignment of certain race-related complaints to two African American employees constitute an affirmative statement or document which shows on its face that an improper criterion served as a basis for the adverse employment action(s). Thus, the Court does not find, as urged by Greig, that he has—as a matter of law—adduced direct evidence of discrimination such that that Court does not need to consider the *McDonnell Douglas* test for consideration of circumstantial evidence.

---

[6] To determine whether comments in the workplace constitute "direct evidence," or only "stray remarks," courts in the Fifth Circuit look to four factors: whether the comments are (1) related to the plaintiff's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision. *Etienne*, 778 F.3d at 476 (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 222 (5th Cir.2001)).

2.      **Circumstantial evidence under the *McDonnell Douglas* framework**

a.      **Greig's *prima facie* case**

Alternatively, Greig claims he has adduced circumstantial evidence that, under the *McDonnell Douglas* framework, is sufficient to defeat TAMUT's motion. Under *McDonnell Douglas*, the plaintiff bears the initial burden to establish a prima facie case of discrimination. *Watkins*, 997 F.3d at 281. To establish a prima facie case of discrimination, Greig must provide summary judgment evidence that he: "(1) is a member of a protected class; (2) was qualified for his position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class," or, in the case of disparate treatment, "that others similarly situated were treated more favorably." *Lovell v. Fort Bend Indep. Sch. Dist.*, No. 4:22-CV-4099, 2025 WL 318214, at *3 (S.D. Tex. Jan. 27, 2025) (quoting *Shackelford v. Deloitte & Touche*, *L.L.P.*, 190 F.3d 398, 404 (5th Cir. 1999)). Title VII's protected classes include race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2(a). The third and fourth elements are the only elements in dispute. Dkt. No. 33 at 8.

As to element three—that Greig was subject to an adverse employment action—Greig bases his claim on two allegedly adverse employment actions: (1) a reassignment in his responsibilities; and (2) his ultimate termination. FAC, ¶ 17. TAMUT does not dispute that Greig's termination is an adverse employment action; however, TAMUT submits that the reassignment of certain of Greig's job duties to African-American employees (even if they are outside of Greig's department) may not form the basis of a Title VII claim because the reassignment is not an adverse employment action. *See* Dkt. No. 33 at 8. Thus, though TAMUT concedes this element is satisfied based on Greig's ultimate termination, TAMUT argues Greig cannot also rely on the reassignment

of his responsibilities to establish this element because the reassignment does not constitute an "ultimate employment decision." Dkt. No. 39 at 5.

The Fifth Circuit recently rejected this logic in *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023). To adequately plead an adverse employment action, plaintiffs need not allege discrimination with respect to an "ultimate employment decision." Instead, a plaintiff need only show that he was discriminated against, because of a protected characteristic, with respect to hiring, firing, compensation, or the "terms, conditions, or privileges of employment"—just as the statute says. *Id.* at 506. A Title VII plaintiff may recover damages even for "discrimination in the 'terms, conditions, or privileges of employment' " that "did not involve a discharge," "loss of pay," or other "concrete effect on [his or her] employment status." *Id.* at 501 (quoting *Landgraf v. USI Film Prod.*, 511 U.S. 244, 254 (1994) (quoting 42 U.S.C. § 2000e-2(a)(1))). Nor is Title VII's coverage "limited to 'economic' or 'tangible' discrimination." *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Any "benefits that comprise the incidents of employment, or that form an aspect of the relationship between the employer and employees," fall within Title VII's ban on discrimination. *Id.* at 501-02 (citation omitted).

Simply put, *Hamilton* rejected the "ultimate-employment-decision test" in favor of a less restrictive standard. *Scroggins v. City of Shreveport*, No. CV 18-0201, 2024 WL 4775106, at *7 (W.D. La. Nov. 13, 2024) (citing *Burchfield v. S. Louisiana Med. Assocs.*, No. CV 23-1501, 2023 WL 5952183, at *4 (E.D. La. Sept. 13, 2023)). Under this less restrictive standard, the alleged reassignment of Greig's investigatory duties to African-American employees may also qualify (along with his termination) as an adverse employment action. *See Reyna*, 2025 WL 317568, at *11 (stating removal from mentorship opportunities can count as an adverse employment action); *see also Harris v. Amazon.com Inc.*, No. 3:22-CV-2279-K-BN, 2024 WL 4958265, at *6 (N.D.

Tex. Nov. 14, 2024), *report and recommendation adopted*, 2024 WL 4960009 (N.D. Tex. Dec. 3, 2024) (finding the plaintiff alleged a discriminatory adverse action by alleging Amazon reassigned him to a substantially more physically demanding position); *see also Hamilton*, 79 F.4th at 509 (Ho., J. concurring) (citing the Department of Justice and suggesting that work assignments happening on the basis of race are actionable under Title VII).

As to element four, TAMUT argues Greig cannot establish a prima facie case of discrimination because Greig does not provide "a single detail to suggest there was any parity between a proposed comparator and himself." Dkt. No. 33 at 11. TAMUT's argument wrongly suggests that Greig is required to show that others similarly situated were treated more favorably in order to establish a prima facie case of discrimination when Greig has shown that he was replaced by someone outside of the protected class. Dkt. No. 35 at 16 (stating his job duties were reassigned to two African-Americans, he was forced to resign in lieu of termination, and he was replaced by an African-American woman). Greig must point to a comparator who was similarly situated and received more favorable treatment under nearly identical circumstances **only if** he claims less favorable treatment in lieu of or in addition to replacement. *See Shahrashoob*, 125 F.4th at 651 (finding the plaintiff had not met her initial burden to make out a prima facie case of discrimination based on the fourth prong's "sub-prong[]" of replacement); *Clark v. City of Alexandria*, 116 F.4th 472, 486 (5th Cir. 2024) (Additionally, <u>if</u> he claims less favorable treatment, he must "point to a comparator who was 'similarly situated' and received more favorable treatment under nearly identical circumstances.") (emphasis added); *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022) ("Circassia also disputes the fourth element by arguing that Owens failed to show that RSMs outside her protected group were treated more favorably. But the district court's holding on this element was based on Owens being replaced by Rich Kosar, a white man,

as Owens submitted declarations from multiple individuals supporting that proposition. Circassia offers no challenge to that holding and, in any event, we agree that Owens has surpassed the 'very minimal' barrier of making her prima facie case."); *Ernst*, 1 F.4th at 339 (stating that Ernst failed to show that he was replaced <u>or</u> that a comparator received more favorable treatment, so summary judgment was proper) (emphasis added); *see also Thompson v. Midland Coll.*, 734 F. Supp. 3d 601, 606 (W.D. Tex. 2024) (the plaintiff argued a white female was selected as the plaintiff's replacement and <u>alternatively</u> argued that two previous Deans of Adult Education and Literacy, both of whom were white, "were accused of engaging in nearly identical conduct," but unlike the plaintiff, were demoted rather than discharged); *see also Renfroe v. CGT U.S. Ltd.*, No. 5-20-CV-00559-FB-RBF, 2023 WL 4357415, at *8 (W.D. Tex. May 19, 2023), *report and recommendation adopted*, 2023 WL 4356070 (W.D. Tex. June 30, 2023) (stating an employee's failure to identify a replacement <u>or</u> "similarly situated comparator" renders summary judgment proper).

Here, at least with regard to his ultimate termination, Greig is not required to identify a comparator. Greig has presented sufficient evidence to create a genuine issue of material fact that he was replaced by someone outside the protected group. *See* TAMUT First Dep. at 83:23-84:9 (stating Greig's replacement was a "Black lady a few years younger than him"). For this reason, TAMUT's motion fails.[7] Greig has surpassed the "very minimal" barrier of making his *prima facie* case. *Owens*, 33 F.4th at 825-26 (quoting *Guthrie v. Tifco Indus.*, 941 F.2d 374, 377 (5th Cir. 1991)).

---

[7] The parties' briefing does not address the specific issue of whether Greig must show a comparator to make a claim based on the reassignment of race-based investigations. *See Reyna*, 2025 WL 317568, at *11 (noting with regard to Reyna's removal from mentoring opportunities that Reyna and a white mentor Tamez were "so similar" because there was evidence that Tamez was in the same department as Reyna and also worked as an assembler; thus, Tamez was a similarly situated person for purposes of national origin and race discrimination, allowing Reyna to show a prima facie case of discrimination). Thus, this Report and Recommendation does not address the issue.

**b.    TAMUT's legitimate, non-discriminatory reason**

Although TAMUT's motion is limited to whether Greig can establish his prima face case of discrimination, TAMUT argues in its reply that "TAMUT has met its burden of establishing the legitimate, non-discriminatory reason for Plaintiff's termination, and Plaintiff cannot establish pretext." Dkt. No. 39 at 10. This puts forth the entire framework of *McDonnell Douglas*: Upon the plaintiff's making that prima facie showing, the defendant may rebut it "by articulating a legitimate, nondiscriminatory reason for [its] actions." *Clark*, 116 F.4th at 486 (quoting *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007)). TAMUT, by claiming the reassignment and termination were due to Greig's poor performance, has presented a legitimate, nondiscriminatory reason for doing so. *Owens*, 33 F.4th at 826. Greig does not dispute that this justification satisfies the second step of *McDonnell Douglas*. *See* Dkt. No. 35 at 11 ("While Defendant argues that it terminated Plaintiff's employment because of Plaintiff's subpar job performance, there is ample evidence in the record that Defendant's true motivation for its actions against Plaintiff was his race."). This leaves the issue of whether Greig has offered sufficient evidence on the third step: pretext.

**c.    Pretext**

Greig must present "substantial evidence" that TAMUT's asserted reason is pretext for discrimination. *Owens*, 33 F.4th at 826 (citation omitted). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded [triers of fact] in the exercise of impartial judgment might reach different conclusions." *Id.* (quoting *Laxton*, 333 F.3d at 579 (quotation and internal quotation marks omitted in *Owens*)). Because TAMUT's reason was Greig's poor performance,  Greig must show that reasonable minds could disagree that these were, indeed, the

reasons for his discharge. *Id.* (citing *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020)) (internal quotation marks omitted).

Greig may meet his burden through use of various forms of circumstantial evidence, including evidence of disparate treatment or evidence tending to show that TAMUT's "explanation is unworthy of credence." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). In general, plaintiffs can use the "false or unworthy of credence" route, showing that the employer's proffered reason is no good, by showing subjective hiring criteria, derogatory comments by decisionmakers, or other evidence showing that the real reason for the employment action was racism. *Reyna*, 2025 WL 317568, at *9 (citing *Manning v. Chevron Chem. Co., L.L.C.*, 332 F.3d 874, 882–83 (5th Cir. 2003)). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves*, 530 U.S. at 148. However, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.*

Two of the proffered reasons for Greig's termination were Greig's handling of the investigation of Student 1's complaint and Greig's handling of the disabled student's complaints. Greig relies on TAMUT's own testimony to contest each. Regarding the first, Greig persuasively argues TAMUT cannot credibly complain about Greig's investigation into Student 1's complaint when a second investigation by Banks reached a similar conclusion and Student 2 remained unpunished. Dkt. No. 35 at 12. Greig's supervisor, Kathy Williams, also said Greig made the right decision not to punish Student 2. Greig Decl., ¶ 11; Stipulation 29.

Regarding the second, Greig points out that TAMUT's corporate representative testified that the broken elevator was not repaired because post-Covid supply chain issues prevented the elevator repairman from obtaining the parts necessary to repair the elevator; Greig solved the problem by allowing the student access to an alternate, accessible laundry facility; and Greig had done nothing wrong in connection with the student's complaint. TAMUT Second Dep. at 201:15-204:21; Stipulations 8-11 (TAMUT concedes that Greig had no "failures or shortcomings" with respect to this student's complaint). Given TAMUT's "own contradictory testimony about its reasons for terminating [Greig's] employment," Dkt. No. 35 at 12-13, a reasonable jury could reject TAMUT's proffered reasons.

Viewing the evidence in the light most favorable to Greig, during his decades of employment with TAMUT, Greig received favorable reviews until July 2022. Greig Decl. at 1; TAMUT First Dep. at 16:13-31:12; *see also id.* at 27:22-28:13 (Banks testifying that in Williams' evaluation of Greig for August 2018 through August 2019, Williams gave Greig an overall rating of "meets the expectations" and noted one of her biggest fears was that Greig was going to retire and further noting, "You're an asset to the university and I'm grateful for all you do. Keep up the good work."). According to Williams' declaration, Williams considered Greig to be "capable and competent in his work and an asset to Texas A & M – Texarkana." Williams Decl., ¶ 6.

Drawing all reasonable inferences in Greig's favor, a reasonable trier of fact could find that TAMUT's proffered justification for termination Greig is false. *Owens*, 33 F.4th at 833. But that alone is not enough. *Id.* The evidence must permit a reasonable inference that TAMUT's false reason was pretext for the true, discriminatory, reason. *Id.* (citations omitted). Whereas the plaintiff in *Owens* provided "scant evidence of discriminatory treatment," *id.*, here a reasonable jury could

conclude, based on the evidence of record, that race discrimination was the true motivation for Greig's termination. *See* Dkt. No. 35 at 13.

After Student 1 was dissatisfied with the result of Greig's investigation, and after having created a "significant uproar" among the students at TAMUT, Dr. Cutrer held a Town Meeting. Stipulations 19, 26. At the Town Meeting, a faculty member stated that TAMUT needed "a person of color" in the Student Affairs department. Stipulation 27. As TAMUT's President, Dr. Cutrer did not address or otherwise reject the faculty member's statement. TAMUT Second Dep. at 213:21-214:1 (stating "she did not say anything to deflect it"); Stipulation 28.

Thereafter, TAMUT reassigned not just Student 1's complaint but all (or practically all) race-related complaints to Favors and Banks, neither of whom previously had a role in student support or student complaints. TAMUT Second Dep. at 189:15-20 (McNiel stating that she was told to start sending any complaints relating to race or discrimination to the Chief of Staff who would then give them to Favors). In doing so, TAMUT bypassed McNiel, a white woman, who did have student support experience, authority, and training.[8] In addition to assigning an African-American man to oversee an African-American woman to repeat Greig's investigation into Student 1's complaint, TAMUT removed Greig from investigating any student complaint that involved race. Stipulation 25. *See* TAMUT First Dep. at 61:3-62:22 (Banks stating it "certainly appeared" to be the case that complaints involving race were removed from Greig's responsibility for investigation and further stating Dr. Cutrer made the decision to remove investigating student complaints involving race from Greig's job duties).

---

[8] It is uncontested that TAMUT did not assign the follow-up investigation of Student 1's complaint to McNiel despite the fact that: (1) McNiel was trained to perform investigations for TAMUT; (2) McNiel knew the students involved from her work with TAMUT's Student Government; (3) McNiel is familiar with TAMUT's Maxient software, which TAMUT used to perform intake, review, and storage of student complaints; and (4) McNiel is the person who received the complaint from Student 1. Stipulation 23.

Shortly thereafter, Williams advised Greig that he should consider looking for a new job because TAMUT intended to blame Greig for the race-related issues on campus after his failure to punish Student 2. Williams Decl., ¶ 7; Greig Decl., ¶ 11. When Williams later resigned from her position, Williams told Greig that she believed the "University President would target him for termination." Williams Decl., ¶ 7.

Following Williams' retirement and Favors' appointment as Greig's immediate supervisor, Favors began to criticize Greig's job performance in March 2022. Greig Decl., ¶ 13; Stipulation 32. Greig responded to the interim Vice President's allegations. Greig Decl., ¶ 13; Stipulation 33. Afterward, TAMUT never addressed these allegations with Greig. Greig Decl., ¶ 14; Stipulation 34.

In July 2022, for the first time in his twenty-five years of employment, Greig received a "not meeting expectations" rating on his yearly evaluation. Greig Decl., ¶ 15; Stipulation 35. Favors told Greig that the students wanted someone younger in Greig's position and that he felt Greig could not relate to people of color. Greig Decl., ¶ 16; *see also* Def. Ex. C at TAMU-000197 (in Favors' 2021 evaluation of Greig, under "Diversity & Respect," Favors rated Greig as "Partially Meet Expectations," noting Greig's challenges with A.L. (one of TAMUT's students with disability discussed below) and particularly with "students of color with issues on diversity"). Greig was given no guidance or goals to follow to improve his allegedly deficient performance. Greig Decl., ¶ 17; TAMUT First Dep. at 126:7-20; TAMUT Second Dep. at 206:18-207:5. Instead, one month later, Dr. Cutrer told Greig that he must resign or be terminated. Stipulation 36; TAMUT First Dep. at 27:2-3, 89:4-19 (stating Favors was also involved in the discussion about presenting Greig the option of being terminated or resigning).

Considering TAMUT's own testimony regarding the reasons TAMUT offers for Greig's termination, and further considering Greig's long history of positive employment reviews and Favors' alleged statement that Greig could not relate to persons of color, TAMUT's reassignment of Greig's job duties to arguably less qualified African-American employees, the lack of guidance or plan to improve Greig's stated deficiencies, the short period of time between these events, the warnings from Greig's former supervisor (Williams), and Greig's unfavorable employment review by Favors, a reasonable jury could find TAMUT's proffered reasons for Greig's termination are merely pretext for race discrimination. The Court, having considered all of the evidence in the light most favorable to Greig, concludes that Greig's prima facie case, combined with sufficient evidence to find that TAMUT's asserted justification is false, may permit the trier of fact to conclude that TAMUT unlawfully discriminated on the basis of race. Therefore, the undersigned recommends TAMUT's motion for summary judgment be denied.

## V. RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 32) and Defendant's Motion for Summary Judgment (Dkt. No. 33) be **DENIED**.

### Objections

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed

determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

SIGNED this the 5th day of March, 2025.

J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE